UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ WTA TOUR, INC., and          │
│ STEVE SIMON,                 │
│                              │
│          Petitioners,        │
│                              │
│     -against-                │
│                              │
│ SUPER SLAM LIMITED and       │
│ ION TIRIAC,                  │
│                              │
│          Respondents.        │
└─────────────────────────────┘
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _____

18-cv-5601 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Petitioner WTA Tour, Incorporated ("WTA") is a New York non-profit membership corporation that organizes a circuit of international women's tennis tournaments. Its members include female tennis players and the companies that own and operate the affiliated tournaments. Co-Petitioner Steve Simon is the WTA's CEO. Respondent Super Slam Limited ("Super Slam" or "SSL") is a Cypriot company and WTA member. Super Slam is owned by co-Respondent Ion Tiriac, a retired professional tennis player and businessman.

Three lawsuits have been filed against the WTA (two of which also name Simon) in Cyprus, Romania, and Spain. Petitioners argue that these suits have been brought by, or on behalf of, respondents. Petitioners further argue that the suits are precluded by Super Slam's Membership Agreement with the WTA, which

1

includes an arbitration clause. Petitioners therefore ask that this Court (1) compel Respondents to arbitrate their claims against WTA and Simon, and (2) enjoin Respondents from prosecuting the foreign lawsuits. Petitioners further request limited discovery relating to the Spanish lawsuit that might support the motion for an anti-suit injunction. Respondents, in turn, move to dismiss the petition on the ground that the arbitration clause does not apply.

After receiving full briefing from the parties, the Court heard oral argument on September 17, 2018. Upon careful consideration, the Court, on October 1, 2018, issued a "bottom-line" Order granting the petition to compel arbitration, denying the motion to dismiss the petition, granting Petitioners' request for limited discovery relating to the Spanish lawsuit, granting the motion for an anti-suit injunction as to the Cyprus lawsuit, and denying the motion for an anti-suit injunction as to the Romanian and Spanish lawsuits, with leave to renew the motion as to the Spanish lawsuit upon completion of the ordered discovery. This Opinion sets forth the reasons for these rulings.

## I. Factual Background

### A. Super Slam's WTA Membership Agreement

The underlying facts are largely undisputed. Petitioner WTA is a New York non-profit membership corporation that organizes a circuit of women's tennis tournaments in 30 countries. Pet. ¶ 14, ECF No. 1. This circuit is known as the "WTA Tour." Pet. ¶ 14. Its

2

members include professional tennis players and the owners of affiliated tournaments. Pet. ¶ 2. Petitioner Steve Simon is WTA's CEO. Pet. ¶ 11.

Respondent Ion Tiriac is a retired Romanian tennis star and current Monaco resident. Pet. ¶ 13. Petitioners allege that Tiriac is the owner of Respondent Super Slam Limited, a Cypriot company. Pet. ¶¶ 12-13. Although Respondents' Rule 7.1 Disclosure Statement (which is not formally part of this motion practice) alleges that Super Slam is wholly owned by Tiriac Holdings Limited, also a Cypriot company, which is in turn owned by the Puma Foundation, a Panamanian company, see ECF No. 16, Respondents concede in their papers that are part of this motion practice that Ion Tiriac is at least "one of the beneficial owners" of Tiriac Holdings. Resp. Mem. Opp. Pet. 2, ECF No. 21. But (while not essential to any of the Court's bottom-line rulings here) it appears that he is in fact the sole owner, or at least is estopped from claiming otherwise, because of the following history:

On July 2, 2008, the WTA entered into a Membership Agreement with Evington Finance Corporation. Leader Decl. Exh. A, ECF No. 6-1. On June 23, 2010, Ion Tiriac sent a request to the WTA asking that the membership rights of Evington Finance Corporation be transferred to a Cypriot company "subject to the confirmation that [Tiriac is] the owner" of both companies. Leader Decl. Exh. A. As part of that request, Tiriac "certif[ied] and covenant[ed]" to the

3

WTA that he was the "sole owner" of both Evington Finance and the Cypriot company. Leader Decl. Exh. A. Tiriac further represented that "[w]e shall continue to comply with the terms of the aforementioned agreement." Leader Decl. Exh. A.

The initially unnamed Cypriot company was later identified as Super Slam Limited. Specifically, on December 13, 2011, Super Slam sent a letter to the WTA "to confirm that Super Slam Limited is a company owned 100% by Mr. Ion Tiriac" and that it was "Mr. Tiriac's wish" that the membership be transferred to Super Slam. Leader Decl. Exh. B, at 3, ECF No. 6-2.[1] The letter was accompanied by certificates indicating that Super Slam's stock was held by two shareholders in trust for Tiriac. Leader Decl. Exh. B, at 4-6.

That same day, a representative of WTA confirmed the transfer. Leader Decl. Exh. E, at 3, ECF No. 6-5. No transfer fee was required because the WTA understood this to be "a transfer in name only" and that "Ion remain[ed] the sole owner of the membership." Leader Decl. Exh. E, at 3.

On January 13, 2012, the WTA entered into a Membership Agreement to transfer Evington's membership rights to Super Slam. Pet. Exh. 1, at 2, ECF No. 1-1. As part of the transfer, Super Slam agreed to assume all of Evington's rights, responsibilities, and obligations under the Membership Agreement. Pet. Exh. 1, at 2.

---

[1] Citations to documents without internal pagination refer to the ECF page number headings.

4

In particular, Super Slam would now have "the right to organize and stage a top level WTA Tournament in Madrid." Pet. Exh. 1 ¶ 2. Super Slam would also be required to arbitrate any disputes "aris[ing] out of or relat[ing] to" the Agreement, as well as "any issues relating to [Super Slam's] WTA membership." Pet. Exh. 1 ¶ 16. Disputes would be governed by New York state law, and the arbitration would be conducted according to the Commercial Arbitration Rules of the American Arbitration Association. Pet. Exh. 1 ¶ 16.

As a result of the WTA Membership Agreement, Super Slam now owns the Mutua Madrid Open, a WTA tournament in Madrid, Spain. The Open is a "combined event," meaning that there is both a women's and a men's tournament, the men's side being organized by the Association of Tennis Professionals. Pet. ¶ 18. The Open is also one of only four "Premiere Mandatory events," meaning all players who qualify for it must participate. Pet. ¶ 18; Pet. Exh. 1 ¶ 3. The Open is, in Respondents' words, "one of the most prestigious annual tennis events," subordinate only to the Grand Slam events and the finals. Resp. Mem. Opp. Pet. 4-5.

Super Slam, as a condition of its Membership Agreement, is required to pay equal prize money in both the men's and women's tournaments. Pet. Exh. 1 ¶ 8(a). According to Respondents, Super Slam has assigned the right to manage the Madrid Open to Limpet Sports Management BV, a Dutch company, which has in turn contracted

5

with Madrid Trophy Promotion ("MTP"), a Spanish company, to organize and promote the tournament. Resp. Mem. Opp. Pet. 5.

## B.    Ilie Nastase is Disciplined by the WTA

In April 2017, Ilie Nastase, another former Romanian tennis star (and not a party to this action), was serving as the "non-playing captain" of the Romanian team during the Federation Cup (or "Fed Cup") event. Pet. ¶ 20. The Fed Cup is organized by the International Tennis Federation; it is not a WTA event. Pet. ¶ 20. Nastase was ejected from the court for "unsportsmanlike conduct" after swearing at game officials and British players, and the ITF provisionally suspended him. Pet. ¶ 20. According to Petitioners, Nastase had also made a series of inappropriate comments in the days leading up to the event. Pet. ¶ 20. Because several of his insults were directed at WTA members, the WTA placed Nastase on its "No Credential List," meaning he could attend WTA events but could not participate or enter restricted areas. Pet. ¶¶ 20-21.

The next month, May 2017, the WTA learned that Nastase was going to present the trophy to the winner of the Mutua Madrid Open. Pet. ¶ 22. Petitioner Simon sent an email cautioning the tournament director against allowing Nastase to participate, since he was on the No Credential List, and warning that sanctions would follow if the tournament went through with it. Pet. ¶ 22. Nonetheless, Nastase was allowed to present the winner of the Open with a trophy during the on-court ceremony. Pet. ¶ 23. According to Respondents,

6

the "Ion Tiriac Trophy" is named for and belongs to Tiriac, and is "one of the most expensive trophies ever made for sport." Resp. Mem. Opp. Pet. 7-8. Respondents also admit that Tiriac decides which guests attend the award ceremony and that it was his decision to have Nastase present the trophy. Resp. Mem. Opp. Pet. 8.

Following the close of the tournament, petitioner Steve Simon released this statement on the WTA website and Twitter account:

It was an exciting final match and I heartily congratulate Simona and Kristina for their outstanding display of tennis. The only shadow cast on the day was Mr. Nastase's invitation to participate in today's award ceremony. He had no place on court today. He is currently under a provisional suspension by the ITF for his prior offensive actions and we revoked his credential privileges at WTA events while the investigation is being completed. It was both irresponsible and unacceptable of the Madrid Open to bestow him an official role. The Madrid tournament is a Premier-level event and held to the highest standards of professional tennis and leadership which were not reflected today.

Pet. ¶ 24.

## C.    Foreign Lawsuits Are Filed Against the WTA

Subsequently, Tiriac brought two lawsuits against the WTA and Simon alleging that the above-quoted statement was defamatory. The first was filed in Cyprus on October 27, 2017, by Tiriac and Super Slam. Resp. Mem. Opp. Pet. 9-10; Pet. Exh. 7, at 2, ECF No. 1-7. The second was brought by Tiriac and Nastase in Romania in January 2018. Resp. Mem. Opp. Pet. 9; Pet. Exh. 3, ECF No. 1-3. Petitioners were served in the Romanian action in February 2018, and in the Cyprus action in April 2018. Pet. ¶¶ 26, 29.

Additionally, Madrid Trophy Promotion sued the WTA in Spain on September 24, 2017, alleging that the WTA had engaged in anti-competitive practices by forcing tournament owners to award equal prize money to male and female winners. Resp. Mem. Opp. Pet. 10-11. Petitioners claim that Tiriac directed MTP to file this lawsuit. Pet. ¶ 34. At least as of August 13, 2018, Petitioners claimed not to have been served in the Spanish action. Tr. Aug. 13, 2018, at 5.

## D. The Instant Petition to Compel Arbitration

Petitioners now seek to enforce the arbitration clause of the Membership Agreement. They ask this Court to compel Super Slam and Tiriac to submit to arbitration. They also seek an anti-suit injunction against all three foreign lawsuits. Pet. at 13. As a fallback alternative to arbitration, Petitioners ask this Court to compel Respondents to litigate their claims in New York, as Petitioners argue is required by the forum selection clause of the WTA By-Laws. Pet. Exh. 2 § 10.12(a), (c), ECF No. 1-2.[2]

Respondents object that several parties to the foreign litigation - Tiriac, Nastase, and MTP - are not signatories to the Membership Agreement between WTA and Super Slam, nor, they argue, have Petitioners alleged any plausible theory by which a non-signatory could be bound by the arbitration agreement. Resp. Mem.

---

[2] The By-Laws are incorporated by reference into the Membership Agreement. Pet. Exh. 1 ¶ 9.

8

Opp. Pet. 12-17. While Respondents do not contest that Super Slam is bound by the Membership Agreement, they take the position that none of the claims at issue in the foreign lawsuits fall within the scope of the arbitration clause. Resp. Mem. Opp. Pet. 17-19.

At the initial conference on August 13, 2018, Petitioners' counsel affirmed that no discovery was requested so far as either the Cypriot or Romanian actions were concerned. Tr. Aug. 13, 2018, at 10. Petitioners requested, however, limited discovery regarding the Spanish action, specifically relating to MTP's relationship to Super Slam and Tiriac. Tr. Aug. 13, 2018, at 10-11. Counsel envisioned "10 or 12 items" of document discovery and three depositions, of Tiriac; of Gerard Tsobanian, the director of the Madrid Open; and of Christos Liasi, a signatory for Super Slam. Tr. Aug. 13, 2018, at 11. Respondents asked that the instant motions be resolved before any discovery were ordered, and this Court agreed. Tr. Aug. 13, 2018, at 14-15.[3]

## II. The Petition to Compel Arbitration

Petitioners seek to compel respondents Super Slam and Ion Tiriac to arbitrate their disputes with WTA and Simon. Respondents do not challenge that the Membership Agreement between Super Slam

---

[3] At the August 13, 2018 appearance, counsel for the parties informed the Court that the first hearing in the Romanian case was scheduled for September 21, 2018. Tr. Aug. 13, 2018, at 12. The parties have not advised the Court what, if any, developments occurred during that hearing.

and WTA is valid, including its arbitration clause. They argue, instead, (1) that the Membership Agreement does not bind non-signatories, including Tiriac, and (2) that the scope of the Membership Agreement does not encompass the claims raised by the foreign lawsuits.

A.  Legal Standard

"[F]ederal policy strongly favors arbitration as an alternative dispute resolution process," and that policy is "even stronger in the context of international business transactions." David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 248 (2d Cir. 1991).[4] To that end, written agreements between commercial parties to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. This Court has subject-matter jurisdiction pursuant to 9 U.S.C. § 203.[5] In deciding whether to compel arbitration, the truth of petitioners' allegations is assumed. Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16, 19 (2d Cir. 1995). Additionally, "any doubts concerning the scope of arbitrable issues should be resolved

---

[4] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

[5] Although Respondents have not asserted an absence of personal jurisdiction, the Court notes that an agreement to arbitrate disputes in New York constitutes consent to personal jurisdiction in New York. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos, 553 F.2d 842, 844 (2d Cir. 1977). Since the Court concludes that both Respondents are bound by the arbitration clause, as detailed herein, it follows that both are subject to the jurisdiction of this Court.

in favor of arbitration." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

A court faced with a petition to compel arbitration must decide two questions: Whether the parties agreed to arbitrate, and whether the claims fall within the scope of the arbitration agreement. Threlkeld, 923 F.2d at 249. "[T]he general presumption is that the issue of arbitrability should be resolved by the courts." Alliance Berstein Inv. Research and Management, Inc. v. Schaffran, 445 F.3d 121, 125 (2d Cir. 2006). This presumption may be overcome by clear and unmistakable evidence that the parties intended to arbitrate issues of arbitrability. Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 393 (2d Cir. 2011).[6] However, "[t]he more basic issue . . . of whether the parties agreed to arbitrate in the first place is one only a court can answer, since in the absence of any arbitration agreement at all, 'questions of arbitrability' could hardly have been clearly and unmistakably given over to an arbitrator." VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P., 717 F.3d 322, 325 n.2 (2d Cir. 2013). Thus, "a court must begin by deciding

---

[6] Although Respondents contend that New York law governs this question, Resp. Mem. Opp. Pet. 12, in fact the question of whether the parties have agreed to arbitrate is one of federal substantive law. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). In any event, "New York follows the same rule" as the federal courts on this issue. Shaw Group Inc. v. Triplefine Intern. Corp., 322 F.3d 115, 121 (2d Cir. 2003).

11

whether the parties before it clearly and unmistakably committed to arbitrate questions regarding the scope of their arbitration agreement." Id. at 326.[7]

## B.    The Parties Bound by the Arbitration Agreement

Respondents have never challenged the validity of the Membership Agreement in general, nor of the arbitration clause specifically. Respondent Super Slam, a signatory of the Membership Agreement, is plainly bound by the arbitration clause, and Respondents have not argued otherwise. Respondents contend, however, that Tiriac, Nastase, and MTP cannot be bound by the Agreement's arbitration clause because they are not signatories. Resp. Mem. Opp. Pet. 13-14.

As an initial matter, Respondents insist that Petitioners seek to compel non-parties Ilie Nastase and MTP to arbitration, and argue that the Court cannot issue an order compelling non-parties to arbitrate. It does not matter whether the Court could do so, however, because - contra Respondents - Petitioners have never asked the Court to do so. See Pet. at 13 (requesting only that the Court grant relief against Respondents); Pet'r's Reply

---

[7] The Second Circuit has held that, when a non-signatory to an arbitration agreement seeks to compel a signatory to arbitrate, the issue of whether the signatory is bound to arbitrate with the non-signatory may be committed to arbitration by the terms of the agreement. See, e.g., Republic of Ecuador, 638 F.3d at 394; Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 209 (2d Cir. 2005). The same is not true when, as here, a signatory seeks to compel a non-signatory to arbitrate. Then the court must first assure itself that the non-signatory has agreed to arbitrate at all before referring to the arbitrator questions of scope.

12

Mem. Supp. Pet. 5, ECF No. 28 (repeating that "Petitioners are *not* seeking to compel MTP or Nastase to arbitrate").

The only remaining question, then, is whether Tiriac may be bound by the arbitration agreement, despite not signing it. Because arbitration is a creature of contract, typically only the parties to an arbitration agreement can be compelled to arbitrate. Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). This does not, however, exempt non-signatories entirely. The Second Circuit has recognized five theories, "aris[ing] out of common law principles of contract and agency law," by which a signatory to an arbitration agreement may compel a non-signatory to arbitrate: incorporation by reference; assumption; agency; veil-piercing/alter-ego; and estoppel. Id. Petitioners argue that Tiriac is bound to the present arbitration agreement by estoppel.[8]

"A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999). A benefit is "direct" when it "flow[s] directly from the agreement," while an indirect benefit is one that derives from the contractual relation between the parties rather than from the contract itself. MAG Portfolio

---

[8] The general thrust of Petitioners' allegations could also be read to suggest an agency or alter-ego theory for compelling Tiriac to arbitrate, but Petitioners have never raised either ground, and in fact specifically disclaimed the agency theory in their reply papers. Pet'r's Reply Mem. Supp. Pet. 7.

13

Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001). Put another way, "benefits are direct when specifically contemplated by the relevant parties; and benefits are indirect when the parties to the agreement with the arbitration clause would not have originally contemplated the non-signatory's eventual benefit." Life Technologies Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011).

Respondents dispute whether Petitioners fairly presented an estoppel theory in their initial papers. Although Petitioners' initial papers could have been clearer in this respect, the Court finds that the argument was adequately presented. Petitioners argued that Tiriac could not "avoid the obligations in the Membership Agreement when he takes the direct benefits of the same agreement - including the reputational, operational, and financial benefits from owning the Madrid Tournament pursuant to the Membership Agreement." Pet'r's Mem. Supp. Pet. 14, ECF No. 5 (emphasis added). This language of "direct benefits" plainly sounds in estoppel. Moreover, immediately following this sentence were citations to two cases about compelling a non-signatory to arbitration via estoppel, followed by explanatory parentheticals highlighting the discussion of the estoppel theory. Pet'r's Mem. Supp. Pet. 14-15. While Petitioners would have been well served to include the word "estoppel" outside of parentheses in their opening memorandum, their failure to do so does not prevent this Court

14

from considering the argument, especially since Respondents were able to respond to it. See Resp. Reply Mem. Supp. Mot. Dismiss 3-5, ECF No. 31.

Petitioners have proffered substantial evidence that Tiriac directly benefitted from the Membership Agreement.[9] It was Tiriac himself who requested that the membership rights be transferred from Evington Finance Corporation - a company which Tiriac represented that he owned - to a Cyprus company, eventually identified as Super Slam, which Tiriac also represented that he owned. Leader Decl. Exh. A. In that same document, Tiriac promised that "[w]e shall continue to comply with the terms of the aforementioned agreement that granted the sanction or membership rights." Leader Decl. Exh. A. Super Slam has itself represented to the WTA that it is "100% owned by Mr. Ion Tiriac." Leader Decl. Exh. B, at 3. WTA understood the transfer to be "a transfer in name only" because "Ion [Tiriac] remains the sole owner of the membership," and it waived the transfer fee that would ordinarily apply on that basis. Leader Decl. Exh. E, at 3. Further still, Tiriac has described himself to the press as the "owner" of the

---

[9] Petitioners have attempted to supplement their proof that Tiriac benefits from the Membership Agreement with dozens of exhibits attached to their reply papers, mostly printouts of online news articles describing Tiriac as the owner of the Madrid Open and reporting his annual income from the event. Although the Court has discretion to consider such exhibits, see Bayway Refining Co. v. Oxygenated Marketing and Trading A.G., 215 F.3d 219, 226 (2d Cir. 2000), the Court finds that such consideration is not necessary to resolve the issues here in dispute.

15

Madrid tournament, Leader Decl. Exh. C, ECF No. 6-3, as well as claiming to make tens of millions of Euros in profit from the tournament each year, Leader Decl. Exh. D, ECF No. 6-4.

Respondents offer virtually no rebuttal beyond misrepresenting Petitioners' argument as "merely contend[ing] that Tiriac is the 100% owner of SSL." Resp. Reply Mem. Supp. Mot. Dismiss 5 (internal quotation marks omitted). Respondents are correct that Tiriac's mere ownership of Super Slam would not bind Tiriac to Super Slam's arbitration agreements. But it is obvious that Tiriac directly benefits from the Membership Agreement, given that he requested the transfer of ownership from Evington to Super Slam; he, Super Slam, and WTA all understood Tiriac to be the real party in interest and the true owner of the Madrid Open; and Tiriac represented himself to the press as owning the Open. Indeed, Respondents' own presentation of the facts notes that the winner of the Madrid Open receives the "Ion Tiriac trophy," which is "one of the most expensive trophies ever made for sport" and "the personal property of Tiriac," "awarded to the winner of the tournament in a ceremony where . . . guests of his choice participate." Resp. Mem. Opp. Pet. 7-8. Respondents also describe the Madrid Open as "one of the most prestigious annual tennis events." Resp. Mem. Opp. Pet. 4.

Thus, even apart from any financial benefit, it is quite clear that Tiriac receives a direct reputational benefit from the fact

16

that his wholly-owned company runs a prestigious tennis tournament featuring a lavish trophy named in his honor. In other words, Tiriac directly benefits from Super Slam's ownership of the tournament, which is itself entirely the result of the Membership Agreement. See Tencara, 170 F.3d at 351-53 (holding that shipowners were bound by arbitration clause in contract between shipyard and American Bureau of Shipping, which inspected the boat; inspection directly benefitted shipowners because it entitled them to lower insurance rates and to sail under the French flag); Everett v. Paul Davis Restoration, Inc., 771 F.3d 380, 384 (7th Cir. 2014) (holding that part owner of franchisee was bound to arbitration agreement with franchisor, despite not being a signatory, as the contract allowed her to "trad[e] upon the name, goodwill, reputation and other direct contractual benefits of the franchise agreement").

Finally, there can be no doubt that the parties "specifically contemplated" that Tiriac would enjoy the benefits of the Agreement. Life Technologies Corp., 803 F. Supp. 2d at 276. Petitioners' exhibits amply show that Tiriac, Super Slam, and WTA all expected Tiriac to be the real owner of the Madrid Open. Thus, Tiriac is bound by the arbitration clause, as is Super Slam.

C.    The Claims Encompassed by the Arbitration Agreement

Respondents argue that the foreign lawsuits - which, again, raise claims of defamation in Cyprus and Romania, and a claim of

17

anti-competitive practices in Spain - do not relate to or arise out of the Membership Agreement. Resp. Mem. Opp. Pet. 18-19. Petitioners contend that this is a question for the arbitrator but, in the alternative, that the disputes are arbitrable. Pet'r's Mem. Supp. Pet. 11-12. Petitioners are correct that, under Second Circuit precedent, the arbitration clause commits questions about the scope of the clause to arbitration.

As relevant here, the arbitration clause provides that "[i]f a dispute arises out of or relates to this Agreement or any issues relating to [Super Slam's] WTA membership . . . any unresolved controversy or claim must be submitted to and settled by arbitration in New York, New York before a single arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association." Pet. Exh. 1 ¶ 16. Those rules, in turn, provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." American Arbitration Association, Commercial Arbitration Rule 7(a). As Petitioners correctly observe, the Second Circuit has squarely held that adopting the AAA's Commercial Arbitration Rules constitutes clear and unmistakable evidence of the parties' intent to arbitrate issues of arbitrability. Contec Corp. v. Remote Solution, Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005); see also VRG Linhas Aereas S.A., 717 F.3d at 326 (similar holding for

agreement adopting rules of ICC International Court of Arbitration); Shaw Group Inc. v. Triplefine International Corp., 322 F.3d 115, 122 (2d Cir. 2003) (same). That dictates the same result here.[10]

For the foregoing reasons, Petitioners' motion to compel respondents Super Slam and Ion Tiriac to arbitrate in New York is granted. Any remaining questions about the scope of arbitrability must be resolved by the arbitrator.

## III. The Motion for Anti-Suit Injunctions

In addition to compelling Super Slam and Tiriac to arbitrate, Petitioners ask that this Court enjoin Respondents from prosecuting or participating in the foreign lawsuits filed in Cyprus, Romania, and Spain. Respondents argue that Petitioners have not made the showing necessary to warrant this extraordinary remedy.

### A. Legal Standard

To demonstrate entitlement to an anti-suit injunction, the moving party must first meet a "threshold" requirement of showing

---

[10] Petitioners also argue that the language in the arbitration clause – "any issues" and "any unresolved controversy or claim" – is broad enough to require arbitration of arbitrability. See, e.g., Shaw Group, 322 F.3d at 121 (language of "all disputes" was broad enough to commit issues of arbitrability to arbitration); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) (similar, for "[a]ny and all controversies"). Because the incorporation of the AAA's Commercial Arbitration Rules is sufficient to require arbitration of this issue, the Court need not reach this alternative argument.

that (1) the parties are the same in both actions and (2) resolution of the case before the enjoining court would be dispositive of the action to be enjoined. Ibeto Petrochemical Industries Ltd. v. M/T Beffen, 475 F.3d 56, 64 (2d Cir. 2007).

If the threshold factors are met, the court must next weigh five factors, "including whether the parallel litigation would: (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment." Keep on Kicking Music, Ltd. v. Hibbert, 268 F. Supp. 3d 585, 590 (S.D.N.Y. 2017). These are referred to as "China Trade factors." See China Trade and Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33 (2d Cir. 1987).

Finally, the moving party must ultimately meet the ordinary requirements for a preliminary injunction, showing: (1) irreparable harm in the absence of the injunction; (2) either a likelihood of success on the merits, or both serious questions going to the merits and a balance of hardships in the movant's favor; and (3) that a preliminary injunction is in the public interest. North American Soccer League, LLC v. United States Soccer Federation, Inc., 883 F.3d 32, 37 (2d Cir. 2018). Principles of international comity demand that anti-suit injunctions be "used sparingly" and "granted only with care and great restraint."

20

Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Info. Tech., Inc., 369 F.3d 645, 652 (2d Cir. 2004).

## B. Threshold Factors

### 1. Identity of Parties

In the Cypriot litigation, the parties are identical to this case: Tiriac and Super Slam on one side, Simon and the WTA on the other. The Romanian action, however, is brought not only by Tiriac, but also by Nastase; the defendants are still Simon and the WTA. Respondents contend that this lack of identity between the parties is fatal. Petitioners argue that they only seek an injunction against Tiriac regarding the Romanian action, so the "identity of parties" factor is satisfied with respect to the injunction sought. Pet'r's Reply Mem. Supp. Pet. 19-20. Although the matter is not entirely free from doubt, the Court is persuaded that Respondents have the better argument.

To qualify for an anti-suit injunction, the parties need not be exactly identical; it is enough if they are substantially similar. Paramedics Electromedicina, 369 F.3d at 652. Parties are substantially similar if the real parties in interest are the same in both cases, as when the additional parties are affiliates of the existing parties or are otherwise irrelevant to the actual relief sought. Id.; Internat'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006) (parties are substantially similar where "their

interests are represented by one another"); Eastman Kodak Co. v. Asia Optical Co., Inc., 118 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) (additional plaintiff in Chinese action did not defeat anti-suit injunction where it was unclear what role that plaintiff played in Chinese proceedings and where that plaintiff did not request relief in the Chinese complaint). Here, however, Nastase is a separate plaintiff in the Romanian action, claiming defamation and harm to his reputation. His interests are neither represented nor vindicated by Tiriac.

Petitioners suggest that this Court can simply enjoin Tiriac from proceeding in the Romanian litigation, leaving Nastase's claims alone. In other words, Petitioners argues that the "action" for China Trade purposes is Tiriac's Romanian claims against WTA and Simon, not the Romanian lawsuit as a whole. The caselaw does not clearly resolve whether Petitioners are correct.

On the one hand, in articulating the standard, the Second Circuit has consistently demanded that the parties to the foreign suit be the same. See, e.g., Paramedics Electromedicina, 369 F.3d at 652 (stating that the parties to the "parallel litigation" must be the same). While this does not explicitly foreclose the possibility of carving up a foreign action piece-by-piece in assessing the suitability of an anti-suit injunction, the language of the rule suggests that the foreign action should be considered as a whole.

On the other hand, since Nastase and Tiriac have separate defamation claims that can proceed independently (and indeed could have been brought as separate lawsuits), an injunction against Tiriac will not prejudice Nastase from proceeding in Romania. Moreover, assuming arguendo that an anti-suit injunction would be warranted if Tiriac had brought a separate Romanian action, no obvious interest is served by permitting him to insulate himself from that remedy by joining his case to the claims of another plaintiff.

This Court has found only a few decisions from courts in this Circuit addressing this precise issue. Unhelpfully, they point in opposite directions. Compare ICBC Standard Securities, Inc. v. Luzuriaga, 217 F. Supp. 3d 733, 742 (S.D.N.Y. 2016) (holding that additional defendant in foreign action precluded issuance of anti-suit injunction), and Computer Associates Intern., Inc. v. Altai, Inc., 950 F. Supp. 48, 54 (E.D.N.Y. 1996) (holding that presence of additional plaintiff and defendant in French action precluded issuance of anti-suit injunction even against party to United States action), with Bank Leumi USA v. Ehrlich, No. 12-cv-4423, 2015 WL 12591663, at *4 (S.D.N.Y. Sept. 23, 2015) (holding that presence of additional defendant in foreign action did not preclude issuance of anti-suit injunction, where relief requested only applied to party who was present in both suits); cf. Sonera Holding B.V. v. Cukurova Holding A.S., 2013 WL 2050914, at *2 (S.D.N.Y.

23

2013) (holding that second threshold factor was satisfied where resolution of the action "would be dispositive of that portion of the action" sought to be enjoined) (emphasis added).

While the foregoing authorities are not dispositive, a cautious approach appears to this Court to be the appropriate course. For one thing, if the China Trade analysis could be conducted piecemeal, there would be no need for the doctrine that "substantial similarity" between the parties suffices. The cases applying that doctrine could instead have been resolved on the ground that the party to be enjoined was present in both actions and that that party's claims were separable from those of the other parties in the foreign lawsuit. Moreover, the Court is mindful that anti-suit injunctions are to be "used sparingly" and "granted only with care and great restraint." Paramedics Electromedicina, 369 F.3d at 652. Those principles suggest that, absent extraordinary circumstances, such injunctions should ordinarily be limited to situations where foreign litigation entirely duplicates domestic litigation.

However, while this means that an anti-suit injunction will not lie in the case of the Romanian action, a separate issue is presented by the Spanish action, which is by MTP against the WTA. Petitioners argue that the "same parties" factor is satisfied here because, they allege, Tiriac totally controls MTP.

24

It is true that Petitioners have adduced some evidence suggesting that Tiriac exercises substantial control over MTP. Moreover, the basis for the Spanish lawsuit - which heavily relies on the WTA Membership Agreement - suggests that either Super Slam or Tiriac, or both, may in fact have a significant interest in that lawsuit.[11] Nonetheless, the full nature of the relationship between Tiriac and MTP remains unclear, and Petitioners have not demonstrated that Tiriac either caused the Spanish lawsuit to be filed or controls its prosecution. Accordingly, on the current record, the Court denies the anti-suit injunction with respect to the Spanish litigation, but without prejudice to the motion being renewed following the discovery granted below.

## 2. Dispositiveness of the Foreign Suits

A ruling that certain claims are arbitrable is dispositive of any foreign suits concerning those claims. Paramedics Electromedicina, 369 F.3d at 653. As discussed above, the Membership Agreement commits all disputes about arbitrability between the parties to arbitration. That determination "disposes of the [foreign lawsuits]" to the extent that "the [foreign] litigation concerns issues that . . . are reserved to arbitration."

---

[11] Specifically, the Spanish lawsuit alleges that WTA abuses its dominant market position to force anti-competitive contracts onto members. Lee Decl. Exh. A, at 11-12, ECF No. 22-1. The complaint references specific terms of the Membership Agreement, including the compensation owed to WTA; the Agreement's non-compete clause; and WTA's alleged failure to comply with the Agreement. Lee Decl. Exh. A, at 13-16.

Id. Therefore, the instant suit is dispositive of the Cypriot action. It is not, however, dispositive of the Romanian or Spanish actions, since those suits involve additional parties who might be entitled to independent relief.

Thus, Petitioners have met their threshold burden for an anti-suit injunction with respect to the Cypriot action, but not with respect to the Romanian or Spanish actions.

C. Additional China Trade Factors

As listed above, the next five factors to consider are whether the foreign litigation would (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment.

Here, litigating the foreign lawsuits would undoubtedly result in added expense and might incentivize a race to judgment. However, since added expense will almost always accompany parallel litigation, the Court does not weigh this factor heavily. China Trade, 837 F.2d at 36.

In Respondents' favor, there is no direct threat to this Court's jurisdiction from the foreign lawsuits, because "[c]oncurrent jurisdiction in two courts does not necessarily result in a conflict" and "parallel proceedings are ordinarily tolerable." China Trade, 837 F.2d at 36. There is no indication

26

that the foreign courts have sought to stay proceedings in this Court or otherwise limit this Court's authority. See id. at 37.

Neither party has made a persuasive showing that equitable considerations favor their side. Respondents suggest that Petitioners were tardy in filing this petition, Resp. Mem. Opp. Pet. 24, but Petitioners accuse Respondents of engaging in vexatious behavior by filing multiple lawsuits across several countries, Pet'r's Mem. Supp. Pet. 23. On the current record, neither of these arguments is sufficiently developed to prove useful in the China Trade analysis.

Rather, the most important factor is that the foreign lawsuits threaten to circumvent the federal public policy of enforcing arbitration clauses, which "applies with particular force in international disputes." Paramedics Electromedicina, 369 F.3d at 654; see also Ibeto Petrochemical, 475 F.3d at 65 (upholding anti-suit injunction in part because "the policy favoring arbitration is a strong one in the federal courts"). When, as here, the parties agreed to arbitrate in New York, it is eminently reasonable to require them to do just that. Whether the foreign lawsuits were brought in order to evade the arbitration clause is immaterial; intentionally or not, the effect of those lawsuits is to frustrate the parties' contractual expectations.

Finally, comity does not weigh against the injunction. The parties are a New York corporation and its CEO, a Cypriot

corporation, and a Romanian national and resident of Monaco. The claims are subject to a provision requiring arbitration in New York according to New York law. Cyprus does not have a stronger interest in hearing this dispute than a New York arbitral forum, nor is it better suited to resolving the threshold issues of arbitrability.

D.    Ordinary Factors for Granting an Injunction

Additionally, however, Petitioners must meet the ordinary standard for a preliminary injunction, i.e. likelihood of success on the merits, irreparable harm absent the injunction, and a showing that the injunction is in the public interest. North American Soccer League, 883 F.3d at 37.

As to the first prong, Petitioners are correct that the relevant inquiry is the likelihood of success on the merits of their argument that the claims must be submitted to arbitration – not, as respondents claim, on the merits of the substantive foreign law claims. Pet'r's Reply Mem. Supp. Pet. 25 (citing Int'l Fashion Prod., B.V. v. Calvin Klein, Inc., No. 95-cv-982, 1995 WL 92321, at *2 [S.D.N.Y. March 7, 1995]); Resp. Mem. Opp. Pet. 24-25. For the reasons stated above, the Court has already concluded that the claims must be submitted to arbitration.

Petitioners claim that the "specter of inconsistent rulings" constitutes irreparable harm. Keep on Kicking Music, 268 F. Supp. 3d at 591. The Court is not convinced by this argument; every

28

instance of concurrent litigation will raise at least the possibility of inconsistent rulings, yet China Trade is quite clear that anti-suit injunctions are to be unusual, not the norm. Nonetheless, Petitioners will suffer irreparable harm if they are forced to litigate rather than arbitrate this dispute. Even if they ultimately prevail in the foreign proceedings, they will have lost the very benefit of the arbitration clause, which was to avoid litigation.

Finally, a preliminary injunction serves the public interest, as enforcing the arbitration clause supports the strong federal policy in favor of arbitration. See Paramedics Electromedicina, 369 F.3d at 654.

Based on the foregoing, Petitioners' motion for an anti-suit injunction is granted as to the Cypriot action. Respondents are enjoined from prosecuting the Cypriot action until the arbitration is completed. See Ibeto Petrochemical, 475 F.3d at 65 (holding that courts should avoid permanent anti-suit injunctions unless necessary). The motion is denied with respect to the Romanian action, based on the lack of identity of parties. The motion is also denied with respect to the Spanish action, with leave to Petitioners to renew that application upon completion of the discovery ordered herein.[12]

---

[12] To the extent that Petitioners seek to enjoin Respondents from filing any new lawsuits in any forum apart from the three specified foreign

## IV. Petitioners' Request for Limited Discovery

At the August 13, 2018 conference, Petitioners requested limited discovery into the relationship between Super Slam, Tiriac, and MTP. The original petition includes little more than allegations that Tiriac controls MTP and caused it to file the Spanish lawsuit. However, those allegations are made somewhat more robust by exhibits attached to Petitioners' reply papers. It appears to the Court that all of the reply exhibits should have been available to Petitioners from the start, and Petitioners offer no explanation for their failure to include them with the original petition. Respondents object, somewhat half-heartedly, to the exhibits being considered. Resp. Reply Mem. Supp. Mot. Dismiss 1 n.1. However, since Respondents filed a sur-reply to Petitioners' reply, and since they do not claim surprise or request additional time to rebut the new exhibits, Respondents have not been prejudiced. Moreover, some of the exhibits seem genuinely material to the issue of whether Petitioners are entitled to any discovery. The Court therefore exercises its discretion to consider the reply exhibits discussed herein. See Bayway Refining Co., 215 F.3d at 226; Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc., 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010).

---

lawsuits, see Pet. at 13, that motion is denied. The Court does not perceive the need for a free-standing general injunction against further litigation at this time.

30

As relevant here, the reply exhibits include a news article describing Tiriac as the owner of MTP, Leader Reply Exh. H, at 5, ECF No. 30-8; another article describing him as the "manager" of MTP, Leader Reply Exh. L, at 12, ECF No. 30-12; correspondence from Gerard Tsobanian, Director General of MTP, describing himself as reporting to Tiriac, Leader Reply Exh. M, at 22-23, ECF No. 30-13; and an article describing Tsobanian as Tiriac's "representative in Spain," Leader Reply Exh. N, at 5, ECF No. 30-14. Petitioner Simon declares that in his conversations with Tiriac and Tsobanian, it has always been clear that Tiriac was in charge. Simon Reply Decl. ¶ 7. Finally, Simon also declares that Tiriac told him that he (Tiriac) had filed suit against the WTA in Madrid. Simon Reply Decl. ¶ 31. Given all this, Petitioners' suspicions about Tiriac's ownership or control of MTP are plausible. The Court therefore grants Petitioners' request for limited discovery on the subject of Tiriac's ownership or control of MTP.

## V. Respondents' Motion to Dismiss

Finally, Respondents move to dismiss the petition for failure to state a claim upon which relief can be granted. Resp. Mem. Opp. Pet. 11-12. Because the Court has found that the petition not only states a claim for relief, but in fact demonstrates entitlement to relief, Respondents' motion to dismiss is denied.

31

## VI. Conclusion and Orders

For the foregoing reasons, the Court hereby reconfirms its Order of October 1, 2018, as follows:

(1) The petition to compel Respondents Super Slam Limited and Ion Tiriac to submit their claims to arbitration in New York is granted.

(2) Respondents Super Slam Limited and Ion Tiriac are hereby enjoined from prosecuting, directing, or participating in the proceedings entitled Super Slam Limited and Ion Tiriac v. Women's Tennis Association and Steve Simon, Action No. 4422/2017, now pending in the District Court of Nicosia in Cyprus, until the completion of the arbitration proceedings ordered herein.

(3) Petitioners' motion for an anti-suit injunction is otherwise denied, with leave to Petitioners to renew the motion with respect to the Spanish lawsuit following the completion of the limited discovery here approved.

(4) Petitioners' motion for discovery from Respondents Super Slam Limited and Ion Tiriac, limited to the subject of Respondents' ownership or control of Madrid Trophy Promotion, is granted.[13]

(5) Respondents' motion to dismiss is denied.

The Clerk of the Court is directed to close documents number 4 and 20 on the docket of this case.

---

[13] By consent order dated October 9, 2018, the Court set a schedule for completion of this discovery. ECF No. 33. By order dated October 12, 2018, the Court denied Respondents' request for cross-discovery. ECF No. 36.

32

SO ORDERED.

Dated:     New York, NY

           October 19, 2018                    JED S. RAKOFF, U.S.D.J.